STATE OF NORTH CAROLINA v. WATSON CARLOS DREW, Defendant

No. COA02-1481

(Filed 17 February 2004)

**Homicide— involuntary manslaughter—sufficiency of evidence**

 The trial court did not commit plain error by submitting to the jury the charge of involuntary manslaughter even though defendant stabbed the victim with a knife, because: (1) there was sufficient evidence to permit the jury to find that when defendant stabbed the victim, he did not act with any intent to kill or inflict serious bodily injury; and (2) contrary to defendant's assertion, there was no indication in the record that he stipulated to intentionally killing the victim.

Appeal by defendant from judgment entered 13 June 2002 by Judge W. Douglas Albright in Columbus County Superior Court. Heard in the Court of Appeals 10 September 2003.

*Attorney General Roy Cooper, by Assistant Attorney General P. Bly Hall, for the State.*

*Poyner & Spruill, L.L.P., by Joseph E. Zeszotarski, Jr., for appellant-defendant.*

GEER, Judge.

Defendant Watson Carlos Drew appeals from his conviction of involuntary manslaughter, arguing that the State offered insufficient evidence to warrant submitting to the jury a charge of involuntary manslaughter as well as voluntary manslaughter. Because the record contains sufficient evidence to permit the jury to find that when defendant stabbed the victim, he did not act with any intent to kill or inflict serious bodily injury, we hold that there was no error.

## Facts

The State's evidence tended to show the following. Defendant lived with his fiancée, Addie Nealey, and her three children in a mobile home in Whiteville, North Carolina. On the night of 27 April 2001, while defendant was working out of state and was not expected home for a day or more, Tony Langley visited Ms. Nealey at the mobile home. Defendant and Mr. Langley had had several altercations over Ms. Nealey. Ms. Nealey allowed Mr. Langley to stay at the mobile home with her and at some point he joined her in her bed under circumstances that are disputed.

At approximately 11:00 p.m., defendant unexpectedly returned home, entering through the back door of the pitch-dark home. Mr. Langley hid in the bathroom while Ms. Nealey intercepted defendant in another part of the mobile home. Ms. Nealey attempted to persuade defendant to drive her to her grandmother's home so that she could pick up two nieces to spend the weekend with them. She explained that she did not want to drive herself because she had taken cold medication and was drowsy.

In a statement given to the Columbus County Sheriff's Department, defendant said that he walked into the kitchen, told Ms. Nealey she was acting funny, and asked her if anyone was in the mobile home. Ms. Nealey first denied anyone else was present, then said she did not know.

Ms. Nealey did not see what happened next and defendant gave conflicting statements. It is, however, undisputed that defendant entered the master bathroom holding a knife. In one statement, defendant claimed he was using the knife to make a sandwich when he heard a noise and went to investigate. In a second statement, defendant claimed that when Ms. Nealey twice suspiciously denied anyone was in the house, he "grabbed the knife and went into the bedroom and looked around[.]"

In the bathroom, defendant saw no one, flipped a cigarette butt into the toilet, and left. When, however, he was just outside the bathroom, he heard a noise. Defendant re-entered the bathroom and saw a man standing behind the door. In his statements, defendant claimed the man lunged or swung at him. Defendant ducked and swung his knife. Defendant then turned and ran out of the mobile home because, according to his statement, he was scared. Ms. Nealey reported that defendant yelled, "Addie, the 'MF' jumped at me. The 'MF' jumped at me."

Defendant later returned to the mobile home and found Ms. Nealey trying to hold Mr. Langley upright. Defendant accused Ms. Nealey of protecting Mr. Langley and started hitting them until Ms. Nealey forced defendant to stop. Defendant then told Ms. Nealey, "I didn't know I stabbed him."

Ms. Nealey left to seek help. When the rescue squad arrived, defendant ran into the woods near the mobile home. As the deputies escorted him in handcuffs out of the woods, defendant told the deputies, "I didn't mean to kill him[.]" Police officers described defendant as "very upset, scared, shaking" and "hysterical."

Mr. Langley died of a single stab wound to the chest and defendant was indicted on a charge of voluntary manslaughter. At trial, defendant did not present any evidence, but asserted a claim of self-defense. The judge submitted to the jury three possible verdicts: guilty of voluntary manslaughter, guilty of involuntary manslaughter, and not guilty. The record does not reveal if the State or defendant requested the involuntary manslaughter instruction or whether the trial court gave the instruction *sua sponte*. Defendant did not, however, express any objection to that instruction. The jury found defendant guilty of involuntary manslaughter and the trial court sentenced defendant to a minimum term of 24 months and a maximum term of 29 months.

---

Defendant asserted eight assignments of error, but failed to bring forth and argue six of them in his brief to this Court. Those assignments of error are therefore deemed abandoned. N.C.R. App. P. 28(b)(6).

Defendant argues that the trial court erred in submitting to the jury a charge of involuntary manslaughter, contending that all the evidence showed that his act in stabbing Mr. Langley was intentional. We apply the plain error standard of review to this assignment of error as

the record does not indicate that defendant objected to the instruction at trial. N.C.R. App. P. 10(c)(4). "In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 378-79 (1983).

Although acknowledging the lack of objection, defendant argues that plain error review is inappropriate, citing *State v. Ataei-Kachuei*, 68 N.C. App. 209, 314 S.E.2d 751, *disc. review denied*, 311 N.C. 763, 321 S.E.2d 146 (1984). In *Ataei-Kachuei*, however, the question of which standard of review to apply did not arise. On the other hand, *State v. Blue*, 115 N.C. App. 108, 112, 443 S.E.2d 748, 750 (1994), specifically holds that the plain error standard applies when reviewing the submission to the jury, without objection, of a lesser included offense. As this Court explained, "[T]o allow a defendant who does not so object to then use his choice at trial to gain reversal on appeal would afford a criminal defendant the right to appellate review, predicated on invited error." *Id.* The lack of an objection is of particular concern because of the possibility, not precluded by the record in this case, that trial counsel for defendant actually wanted the instruction to be given.

In deciding whether to charge the jury as to a lesser included offense, "the trial judge must make two determinations. The first is whether the lesser offense is, as a matter of law, an included offense of the crime for which defendant is indicted. . . . The second is whether there is evidence in the case which will support a conviction of the lesser included offense." *State v. Thomas*, 325 N.C. 583, 590-91, 386 S.E.2d 555, 559 (1989). Since defendant accepts that involuntary manslaughter is a lesser included offense of voluntary manslaughter, the question before this Court is whether the record contains evidence from which the jury could find that defendant committed involuntary manslaughter.

Involuntary manslaughter has been defined by our Courts in two ways:

> Involuntary manslaughter is the unlawful killing of a human being without malice, without premeditation and deliberation, and without intention to kill or inflict serious bodily injury. Involuntary manslaughter may also be defined as the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor

naturally dangerous to human life, or (2) a culpably negligent act or omission.

*State v. Powell*, 336 N.C. 762, 767, 446 S.E.2d 26, 29 (1994) (citations omitted). Involuntary manslaughter is distinguished from murder or voluntary manslaughter by "the absence of malice, premeditation, deliberation, intent to kill, and intent to inflict serious bodily injury . . . ." *State v. Greene*, 314 N.C. 649, 651, 336 S.E.2d 87, 89 (1985).

Although the crime in this case involved a deadly weapon—a knife—defendant may still be found guilty of involuntary manslaughter if he acted without any intent to kill or inflict serious injury. As the Supreme Court has held, "involuntary manslaughter can be committed by the wanton and reckless use of a deadly weapon such as a firearm or a knife." *State v. Buck*, 310 N.C. 602, 605, 313 S.E.2d 550, 552 (1984) (citations omitted).

In *State v. Daniels*, 87 N.C. App. 287, 360 S.E.2d 470 (1987), as here, the defendant argued that the trial court erred in submitting involuntary manslaughter as a possible verdict when the defendant had stabbed the victim. In *Daniels*, the defendant, who was in a fight with the victim, "stuck at him, trying to get him away from [her]", but "she did not intend to either stab or hurt [the victim.]" *Id.* at 288, 360 S.E.2d at 470. The Court also observed that the defendant had claimed, in her statements, that she did not mean to hurt the victim. This Court held that "[e]vidence indicating that [the victim's] death was caused by defendant inadvertently stabbing him in the chest while not attempting or intending to do so clearly meets [the] requirement" that the killing was the result of an act done in a culpable or criminally negligent way. *Id.* at 289, 360 S.E.2d at 471.

The evidence in this case is comparable. There were no eyewitnesses to the actual stabbing; the sole evidence of what occurred in the bathroom is found in defendant's statements to the Sheriff's Department. From those statements, a jury could find that defendant, who had been told that no one was in the house, was surprised in the bathroom by a man whom he did not immediately recognize; that the intruder lunged or swung at him; that he immediately swung back holding the knife; and that he ran away out of fear. The jury could also find, based on defendant's statements and the testimony of the officers, that defendant did not know that he had stabbed Mr. Langley and that he did not intend to kill him. Officers confirmed that defendant was "hysterical" and "very upset" when they found him.

From this evidence, the jury could have further concluded that defendant panicked after discovering Langley and either (1) intended to strike at Mr. Langley to keep him away, but did not intend to kill or seriously injure him; or (2) simply reacted instinctively without any intent to strike Mr. Langley at all. Either scenario would support a verdict of involuntary manslaughter under *Daniels*. *See also Buck*, 310 N.C. at 606, 313 S.E.2d at 553 (involuntary manslaughter was properly submitted to the jury when the defendant testified that he grabbed a knife because he was scared of the victim who also had a knife, that defendant threw the victim to the floor, that the victim was stabbed with the defendant's knife as the defendant fell on top · of him while holding the knife, and that defendant did not intend to stab the victim).

Defendant, however, claims that he stipulated at the outset of the trial that he intentionally killed Langley. Our review of the record reveals that defendant never made such a stipulation. Instead, out of the hearing of the jury, counsel for defendant, documented on the record that defendant had consented to counsel's conceding at trial, if he chose to do so, that "the stab wound was administered." Counsel was acting pursuant to *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507-08 (1985) ("[W]e conclude that ineffective assistance of counsel, per se in violation of the Sixth Amendment, has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent."), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672, 106 S. Ct. 1992 (1986). When the trial court asked whether defendant was stipulating that he intentionally stabbed the deceased, counsel stated unambiguously, "I am not so stipulating at this point." There is no indication in the record that defendant ultimately at trial ever stipulated or otherwise admitted that he intentionally stabbed Mr. Langley.

Although defendant also points to *Ataei-Kachuei* as precluding submission of the instruction, all of the evidence in *Ataei-Kachuei* established that the defendant, who fired multiple gunshots into a car, intentionally shot the victim. No such dispositive evidence was presented in this case. We therefore hold that the trial court did not err in submitting the issue of involuntary manslaughter to the jury. *See also State v. Lytton*, 319 N.C. 422, 427, 355 S.E.2d 485, 488 (1987) (even though, during a struggle, defendant had his finger on the trigger of a loaded pistol and intentionally shot a warning shot, the trial court should have instructed the jury on involuntary manslaughter when defendant testified that he did not intend to pull the trigger on

ROBERTS v. CENTURY CONTR'RS, INC.

[162 N.C. App. 688 (2004)]

the second and third shots, did not aim the pistol, and did not intend to shoot the victim).

Our holding that sufficient evidence existed to support submission of the issue of involuntary manslaughter to the jury resolves defendant's second argument that the ultimate verdict was unsupported by the evidence.

No error.

Chief Judge MARTIN and Judge BRYANT concur.